Russell A. Robinson, SBN 163937
Law Office of Russell A. Robinson
345 Grove Street, 1st Floor
San Francisco, CA 94102
Phone: 415.861.4416
Fax: 415.431.4526
rlaw345@gmail.com

Counsel for Plaintiff
**JUAN ESPINOZA**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN ESPINOZA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF TRACY, R. LEON CHURCHILL, JR., and DOES -40, inclusive,<br><br>Defendants.<br>_______________________________________/ | Case No. 15-0751-WBS-KJN<br><br>**AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>[Jury Trial Demanded] |

This action arises under 42 USC §1983, et seq., and other provisions of federal and state law. Jurisdiction is proper in this Court under 28 USC §1331. Claims alleged arose in and around the City of Tracy, County of San Joaquin. Venue and assignment are proper in the United States District Court for the Eastern District of California, Sacramento.

COMES NOW PLAINTIFF JUAN ESPINOZA AND ALLEGES AS FOLLOWS:

1. Plaintiff Juan Espinoza was employed by Defendant CITY OF TRACY ("City" or "Tracy") at Tracy's POLICE DEPARTMENT ("TPD") in the capacity of police captain. Plaintiff was continuously employed by Tracy since February 15, 1995, having been promoted from lieutenant to captain. On about July 29, 2013, Plaintiff was forced to retire by the actions of Defendants named herein. Of Mexican ancestry, Plaintiff was in fact one of only a small number of Latin officers employed by Tracy until he was constructively terminated.

/ / /

2. After complaining about conditions of employment, an action was filed on about March 14, 2011, in San Joaquin County Superior Court. A that time, Plaintiff included the TPD as a defendant in that action. Since the filing thereof, Tracy conceded that the TPD is not an entity capable of being sued; thus, Plaintiff in turn agreed that the TPD should be withdrawn as a named-defendant therein. Plaintiff shall pray leave to amend here should he need to name the TPD as a defendant.

3. Plaintiff Espinoza was a permanent employee of Tracy and was classified as a peace officer under Penal Code section 830.1. Espinoza therefore is, and at all times herein mentioned was, entitled to rights and privileges of the Public Safety Officers Procedural Bill of Rights Act (the Act or POBR) as codified at California Government Code sections 3300, et seq., with a protected property interest in his employment.

4. Defendant City is, and at all times mentioned was, a political subdivision organized and existing under the laws of the State of California. Tracy is a general law city.

5. Defendant R. LEON CHURCHILL, JR., was City Manager for the City of Tracy. Churchill, charged with knowledge of constitutional mandates and city management, was one of the primary policy makers for the City. By Churchill's own admission, all significant personnel decisions while he was City Manager were his responsibility. Churchill is sued in his individual capacity; on information and belief, Churchill essentially was terminated in March 2014 because of Churchill's use of his City credit card and a resulting series of policy violations.

6. JANET THIESSEN was at times mentioned Chief of Police for the City of Tracy, and was from February 2009 until August 2011, Plaintiff's supervisor. Thiessen, charged with understanding and enforcing the laws of the State of California as the TPD's chief and with knowledge of constitutional mandates, was on information and belief the primary policy maker for the TPD until August 2011. While not a defendant herein, Thiessen played a role in some of the below-described acts.

7. GARY HAMPTON, was from August 2011 through about mid-2016, Chief of Police in the City of Tracy. He was Plaintiff's direct supervisor. Hampton, charged with understanding and enforcing the laws of the State of California as the TPD's chief and with

knowledge of constitutional mandates, was and is on information and belief a policy maker for the TPD. He was personally picked and hired by Churchill to be the Chief of Police, and often carried out mandates issued by Churchill as these related to personnel matters.

8. The true names and capacities of other potential Defendants sued herein as DOES 1-40 ("DOE defendants") are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names, and Plaintiff will seek leave to amend this complaint to show their true names and capacities when the same are ascertained. On information and belief, each DOE defendant was an employee/agent of the co-defendants, and at all material times acted within the course and scope of that relationship.

9. Plaintiff is informed and believes each Defendant sued herein was wrongfully and otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff. Further, one or more DOE defendants was at all material times responsible for hiring, training, supervision, and discipline of the other defendants.

10. Plaintiff is informed and believes that each Defendant was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiff is further informed and believes that each Defendant gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise specifically alleged.

11. All or most of the acts complained of took place in the County of San Joaquin.

12. Espinoza may bring an action for injunctive relief.

13. This Court has jurisdiction over this proceeding under 42 USC §1331.

14. On or about September 1, 2010, Espinoza filed a government tort claim against the City. City notified Espinoza said claim was rejected on about September 13, 2010.

15. On or about October 4, 2011, Espinoza filed a second government tort claim against the City, alleging retaliation and other conduct by Defendant Churchill. City notified

Espinoza said claim was rejected on about October 27, 2011.

16. The above-referenced state court action was filed March 14, 2011. While the original complaint was never served on Defendants, on information and belief each knew of this action shortly after filing and had been provided a copy of the action long before June 1, 2011.

17. In that state case, Espinoza caused an amended complaint to be filed on November 14, 2011. Defendant Tracy answered the amended complaint on about December 14, 2011. Thereafter, discovery commenced in 2012 and certain claims or causes of action were dismissed upon successive motions and/or demurrers by the defense. That action was voluntarily dismissed by Plaintiff without prejudice in September 2014.

18. Plaintiff is informed and believes that unlawful employment actions complained of herein, as a result of which Plaintiff sustained injuries and damages enumerated herein, were and are violations of the laws and fundamental public policies of the State of California and the Constitution of the United States of America.

19. Plaintiff's claims are thus not subject to the exclusive remedy provisions of California's Worker's Compensation Act and not otherwise barred or preempted.

**FACTS COMMON TO ALL CAUSES OF ACTION**

20. Prior to and after commencing the state action, Plaintiff complained formally and informally about the investigation into allegations of discrimination against Plaintiff by Tracy in connection with a lieutenant at the TPD. Prior to and after commencing the state action, Plaintiff complained formally and informally about the investigation into allegations by Tracy in connection with the purported failure by Defendant to report an in-custody death.

21. Plaintiff *alleged* with regard to these two complaints that Tracy, Does 1-40, and each of them, refused to surrender investigation, notes, tapes, and other requested materials so Plaintiff could defend himself through due process; that the City destroyed evidence; that Tracy transferred Plaintiff from command bureau; that Tracy failed to promote Plaintiff to acting Chief causing denial of pay, standing for job or similar job through experience gained; that Plaintiff was denied the position of Acting Chief of Police in violation of past practice; that Tracy had engaged in destruction of evidence created in connection with investigations of Plaintiff;

that Tracy brought false accusations and retaliatory investigations against Plaintiff alleging he did not notify the Chief of Police (Thiessen at that time) about an in-custody death in which City knew he was not involved; that Tracy mandated additional training for Plaintiff; that Tracy effected the removal of Plaintiff from city and community activities to isolate him, and, that Tracy had engaged in threats of retaliation for filing the state action.

22. On November 19, 2009, Plaintiff was interviewed by an investigator retained by Tracy regarding a false allegation that Plaintiff had failed to notify the Chief (Janet Thiessen) about an in-custody death. The death had occurred on about September 9, 2009, and Thiessen had questioned Plaintiff about that incident before giving Plaintiff formal notice required by California law, and well before the November 19, 2009, interview.

23. As of October 4, 2011, the investigation had not been closed; or, if it had been closed, Plaintiff was not advised of this fact until February 8, 2013, as set forth below.

24. The “open” investigation could not as a matter of law form a basis for any subsequent investigation or disciplinary action by Tracy. Nonetheless, that “open” investigation arising from the September 2009 in-custody death was used by Tracy and Churchill as recently as August or September 2011 as evidence by Plaintiff of alleged misconduct. Despite many requests for the results of this IA, and for a finding from the City that the IA was closed, Espinoza was not informed the IA was closed until the **January 9, 2013,** deposition of Chief Gary Hampton in the *state case.* Espinoza was never provided the written report until his own **February 8, 2013,** deposition in that *case.*

25. Defendant Tracy did not give a test for the 2011 Chief of Police position, thereby denying Plaintiff the opportunity to test. In “appointing” current Chief of Police, Gary Hampton, Defendant Tracy made good on threats voiced by Bill Mathis, Ph.D., on about June 15, 2011. On June 15, 2011, Plaintiff was called to a meeting with then-Chief Janet Thiessen. Rather than spend time meeting with Plaintiff, Thiessen forced Plaintiff to meet with Bill Mathis, Ph.D., who, on information and belief, was/is a consultant hired by Tracy.

26. During the above-mentioned meeting, Mathis told Plaintiff that Plaintiff would never be made interim Chief of the Tracy Police Department unless Plaintiff dismissed his

lawsuit (the state action).

27. As alleged above and in prior pleadings, Plaintiff was subjected to selective enforcement of the disciplinary process. For example, Plaintiff was subjected to two, unwarranted Internal Affair investigations (IA) and in both cases the City failed to prove any misconduct by Plaintiff, yet both were left open despite clear mandates, and Plaintiff's demands, that these be officially closed and properly designated. Plaintiff was also denied the opportunity to receive complete information obtained during the course of at least one of the investigations (that dealing with the in-custody death) so Plaintiff could evaluate and respond to any negative entries/comments made against him. Other members of the TPD, particularly two or three in Thiessen's favor, were allowed to act in insubordinate ways, to undermine authority of Plaintiff and others, and to engage in acts of defiance because they were favored, all to the detriment of the TPD and public.

28. On or about June 8, 2011, Thiessen announced her resignation as Chief of Police, with an effective date of July 8, 2011. On or about July 5, 2011, Thiessen publicly criticized, in both print media and video news media, the City and the TPD, alleging gender bias by males in the Department as the cause of her failure as Chief. Tracy City Mayor Brent Ives then went on video media and denounced Thiessen's allegation as untrue.

29. Thiessen's public criticism of the City and Department, while protected, was in violation of City and Department policy, particularly in view of the fact that she leveled criticism while wearing her official police uniform; and, that criticism created further discontent among staff members because of the allegations. Nonetheless, Defendant Churchill asked Thiessen to remain an additional six weeks as the interim chief of police until an outside person was hired. Thiessen was then granted a generous severance package, even though she publicly stated she "quit" and City Manager Churchill publicly stated she resigned. Under established City policy, one who resigns or quits ordinarily does not and did not receive such generous severance packages. Thiessen's contract stipulated that she was only due a severance package if she was forced to resign or was terminated. On information and belief, Thiessen's favorable treatment upon her resignation is further evidence of nepotism and favoritism

permeating the City and Department while Churchill was City Manager.

30. During the six weeks Thiessen was allowed to remain as interim chief, Plaintiff Juan Espinoza, then the highest-ranking and most senior of all sworn command officers, was not allowed to work as acting or interim chief and was not considered for the position. The City's past practice has been to appoint other senior command personnel or managers to serve as acting or interim chiefs or department heads until a permanent chief or department head is selected through a competitive process. Plaintiff is informed and believes the conduct by Defendants, in allowing Thiessen to stay as interim chief while denying Plaintiff the right to work as interim or acting chief, was in retaliation for Plaintiff's protected activity, including but not limited to the state action and the afore-mentioned government claims. Conduct by Defendants and each of them evinces nepotism and favoritism, ways in which the *de facto* policy of retaliation manifests against those not part of the group loyal to Churchill and others at Tracy.

31. During the time she was Chief of Police, Thiessen oversaw a Department which not infrequently engaged in retaliation against officers within the TPD and private citizens. In one situation, a private citizen complained about dishonesty by Thiessen. Churchill, a witness to Thiessen's misconduct, ignored conflict of interest issues in eventually determining that the violation which he personally witnessed by Thiessen was "exonerated." According to TPD policy, "exonerated" means "the investigation has determined that the acts which provided the basis for the complaint occurred, however, investigation revealed that the acts were justified, lawful or proper." Churchill's actions condoned misconduct in allowing the chief of police to be dishonest. Thiessen then used the powers of the TPD under her control to harass private citizens who complained in much the same way Plaintiff was abused by Thiessen's misuse of the TPD's IA process.

32. During the course of aforementioned discovery in the state litigation, Plaintiff finally learned the results of the investigation initiated against him by Tracy and Thiessen regarding the in-custody death. On about February 8, 2013, during his deposition, Plaintiff was provided the documentation for the first time as to an investigation that was several years old, and that should have been closed with proper notice to Plaintiff long before February 8, 2013.

Plainitff had formally complained about this investigation and the handling of the investigation by Tracy on October 4, 2011.

33. In connection with his deposition, what appeared to be a conflict of interest became manifest on February 8, 2013. That is, counsel for Tracy was engaging in *ex parte* communications with Plaintiff, without consent of Plaintiff's counsel about personnel matters. Tracy was also treating Plaintiff as its joint, or dual, client in personnel matters which Plaintiff had been charged with investigating and which were going to arbitration.

34. That is, during Plaintiff's February 8, 2013, deposition, it became apparent to Plaintiff and counsel that a conflict of interest likely existed; attorneys working for the same law firm as those representing Defendants in the state case were having *ex parte* communications with Plaintiff about personnel matters, seeking Plaintiff's thought processes, and engaging in what in good faith appeared to be improper and prohibited contacts with Plaintiff; in fact, on information and belief, the supervising attorney in the state matter and in the related personnel matters was attorney Cynthia O'Neill.

35. Plaintiff notified defense counsel of the impropriety of these contacts shortly after February 8, 2013. Thereafter, through counsel, Plaintiff obtained a stay of the state action pending outcome of a motion to disqualify defense counsel herein. With the integrity of the legal profession a matter of public concern, Plaintiff's motion was served late the afternoon of April 3, 2013, on defense counsel in San Francisco.

36. On the early morning of April 4, 2013, about 17 hours after the motion was served on defense counsel in San Francisco, and before the motion to disqualify was filed in the San Joaquin County Superior Court, Plaintiff was placed on administrative leave by Hampton at the direction of Churchill.

37. On information and belief, in connection with Plaintiff's April 4, 2013, suspension, an administrative action was initiated by Hampton, Churchill, Tracy, and Does 1-40 against Plaintiff almost immediately.

38. In connection with Plaintiff's April 4, 2013, suspension, Hampton immediately ordered Plaintiff to relinquish Plaintiff's iPhone issued by the TPD. In this regard, Plaintiff was

treated in a manner completely different that other officers suspended under Hampton. On direct orders from Churchill, Hampton ordered Espinoza's iPhone seized and searched. Espinoza was the first person employed by the TPD subjected to such a search and seizure.

A. Before he was hired at Tracy, Espinoza was employed by the City of Hayward at its police department;

B. One of Espinoza's fellow Hayward officers was David Helm, who was shot in the line of duty and eventually retired to Tracy;

C. Espinoza and Helm remained close. Now Helm lived in Tracy and Espinoza worked in Tracy;

D. Starting in about 2011, Helm, a private citizen, began to make requests for records under the California Public Records Act (CPRA) in addition to lodging formal and informal complaints about a pattern of retaliation at the TPD. A number of Helm's complaints concerned Thiessen and Churchill. In fact, it was private citizen Helm who brought forth Churchill's credit card misuse which ultimately led to Churchill's termination;

E. During the underlying state court matter mentioned above (*see, e.g.,* ¶2), Plaintiff Espinoza was repeatedly questioned about his relationship with Helm, their history together at Hayward, and their friendship;

F. About the time Churchill began feeling additional pressure from Helm about credit card misuse and policy violations, Espinoza filed his April 3, 2013, motion to disqualify defense counsel in the underlying case; thus,

G. Churchill, who had already tried and failed to use police to retaliate against Helm while Thiessen was chief, used alleged disclosure of two officers' names by Espinoza in the motion to disqualify as a pretext to initiate through Hampton Espinoza's suspension and eventual July 29, 2013, termination.

39. Once on indefinite suspension, Plaintiff proceeded through the sham administrative process (during which Plaintiff was not provided with an explanation of his employer's evidence, and during which Hampton communicated through one or more third parties that Espinoza would never come back to work at the TPD), which was in fact discipline imposed on Plaintiff in retaliation for his association with Helm and for exercising the protected right of seeking redress for grievances.

40. As a direct result of suspension, sham administrative process, discrimination based on Plaintiff's race and ethnic origin (Latin/Mexican – Caucasian officers under the administrative discipline process at TPD, for example, were not subjected to the search and seizures to which Espinoza was subjected), disparate treatment, selective prosecution, and

other unfair and retaliatory actions, Plaintiff was in fact constructively terminated fro the City of Tracy on about July 29, 2013, when he was forced to retire.

**FIRST CAUSE OF ACTION**

**42 USC §1983**

**(As to all named Defendants)**

41. Plaintiff incorporates by reference all of the preceding paragraphs as though set forth fully herein.

42. As referenced above, during Plaintiff's February 8, 2013, deposition in the state case, it became apparent to Plaintiff and his attorney that a conflict of interest likely existed in that attorneys working for the same law firm as those representing Defendants in the state case were having *ex parte* communications with Plaintiff about personnel matters, seeking Plaintiff's thought processes, and engaging in what appeared to be improper and prohibited contacts with Plaintiff; in fact, on information and belief, the supervising attorney in the state matter and in the personnel matters was attorney Cynthia O'Neill.

43. Plaintiff notified defense counsel of the impropriety of these contacts shortly after February 8, 2013. Thereafter, through counsel, Plaintiff obtained a stay of the state action pending outcome of a motion to disqualify defense counsel herein. That motion was served late the afternoon of April 3, 2013, on defense counsel in San Francisco.

44. On the early morning of April 4, 2013, about 17 hours after the motion was served on defense counsel in San Francisco, and before the motion to disqualify was filed in the San Joaquin County Superior Court, Plaintiff was placed on administrative leave directly by Hampton at the direction of Churchill. The memorandum or notice was apparently authored by Hampton and approved by Churchill, and was handed to Plaintiff by Hampton.

45. On information and belief, Defendant in connection with Plaintiff's April 4, 2013, suspension, an administrative action was initiated by Churchill, Tracy, and Does 1-40, through Hampton and the TPD, against Plaintiff almost immediately.

46. In connection with Plaintiff's April 4, 2013, suspension, Hampton immediately ordered Plaintiff to relinquish Plaintiff's iPhone issued by the TPD. In this regard, Plaintiff was

treated in a manner completely different than other officers suspended under Hampton. Plaintiff's iPhone, seized thus unlawfully, was subjected to a search with Plaintiff's privacy invaded. Private texts and e-mails were captured by Tracy. On information and belief, Espinoza's desk and other private areas at the TPD were searched after he was barred from the premises, in an effort to find as much negative information about Espinoza as possible; again, private material was seized in the course of these unlawful searches.

47. On indefinite suspension, Plaintiff proceeded through the sham administrative process, which was in fact discipline imposed on Plaintiff in retaliation as described above.

48. As a direct result of suspension, sham administrative process, disparate treatment, and other unfair and retaliatory actions, Plaintiff was in fact constructively terminated as Captain of Police with the City of Tracy on about July 29, 2013, when he was forced to retire.

49. Plaintiff is informed that, as to Defendants and each of them, each was acting pursuant to official, *de facto* policies and in concert with one another when they injured Plaintiff; each was acting in concert with the co-defendants, with the shared objective to injure the plaintiff and others like him. The violations included but were not limited to the following:

a. Right to be free from discrimination;

b. Right to be free from retaliation, as well as freedom of association;

c. Right to procedural and substantive due process; and/or,

d. Right to Equal Protection of the Law.

50. Said rights are substantive guarantees under the First, Fourth, and/or Fourteenth Amendments to the United States Constitution.

51. On information and belief, Plaintiff was suspended on April 4, 2013 (placed on admin leave) as an act of retaliation, selective prosecution, and discrimination.

52. Further, after Plaintiff was constructively terminated July 29, 2013, with an effective date of July 30, 2013, Defendant Tracy delayed paying Plaintiff his accrued vacation pay. On information and belief, this accrued vacation pay was due within a reasonable time after Plaintiff separated from employment with Tracy, but no later than two weeks after July 30, 2013. Plaintiff did not receive this accrued vacation pay until late February 2014, almost seven

months following his forced retirement. Accrued vacation pay was only received after Plaintiff filed additional claims under state law and with the California Labor Commissioner.

53. In addition to refusing to pay the accrued vacation pay in a timely manner, Defendant Tracy, at the control of Churchill, canceled Plaintiff's health insurance, which included coverage for Plaintiff and his family comprised of wife and three sons. After canceling Plaintiff's long-time medical coverage through Health Net, in about December 2013, retroactive to October 2013, Defendants assigned Plaintiff to a different health plan through Kaiser Permanente; Plaintiff never elected Kaiser coverage, and never indicated he intended to cease having medical insurance through Health Net.

54 These additional acts were intended, on information and belief, by Defendants Churchill, Tracy, Does 1-40, and each of them, to cause Plaintiff financial hardship and general damage. In fact, the suspension of April 4, 2013, the forced retirement of July 29 2013, failure to pay accrued vacation pay upon separation, the cancellation of health insurance, and related acts caused Plaintiff financial hardship and severe emotional distress, worry, frustration, stress, and related sequelae. Plaintiff was damaged by Defendants' acts.

WHEREFORE, Plaintiff prays for relief as set forth below.

**SECOND CAUSE OF ACTION**

**42 USC §1983**

**(As to all named Defendants)**

55. Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

56. Plaintiff is informed that, as to supervisory Defendants such as Churchill, and each of them, each created, condoned, ratified, or was otherwise responsible for the official, *de facto* policies which were the moving force in causing Plaintiff's damages and injuries. The unlawful practices, customs, and/or *de facto* policies, included but were not limited to the following:

a. Discrimination in discipline and investigations;

b. Retaliation for engaging in protected activity;

c. Infringement of the right to due process; and/or,

d. Infringement of the right to Equal Protection of the Law.

57. Said rights are substantive guarantees under the First, Fourth, and/or Fourteenth Amendments to the United States Constitution.

58. Plaintiff on information and belief was suspended in retaliation for his associations and for exercising protected activity; and, the reason given for his suspension was pre-textual reason. That is, he was told he was being placed on administrative leave for the [limited] disclosure of third-party, peace officer information.

59. Yet, after Plaintiff separated from employment on July 29, 2013, with an effective date of July 30, 203, Defendant Hampton made public disclosures of this information in direct violation of the very same law(s) which Plaintiff was accused of violating. Additionally, Captain Jeremy Whitney, who replaced Plaintiff, also made public, non-protected disclosures about Plaintiff's separation, again in violation of the very same law(s) which Plaintiff had been accused of violating on about April 3 or April 4, 2013. No disciplinary action was commenced against Hampton or Whitney by Churchill. On information and belief, violations of California law by Hampton and Whitney were done in furtherance of the desire to discredit and to humble Plaintiff, and pursuant to an agreement among Defendants and their unindicted co-conspirators to retaliate against, and to damage, Espinoza. Plaintiff was damaged by Defendants' acts.

WHEREFORE, Plaintiff prays for relief as set forth below.

**THIRD CAUSE OF ACTION**

**42 USC §1985**

**(As to all named Defendants)**

60. Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

61. Under 42 USC section 1985(2), by suspending Plaintiff April 4, 2013, and by engaging in the sham disciplinary process, Defendants obstructed justice and intimidated Plainitff to such a degree that he was eventually forced to retire as of July 29, 2013. They conspired to deter, by force, intimidation, or threat, Plaintiff from testifying to any matter

pending therein, freely, fully, and truthfully, and injured Plaintiff in his person or property (his position as a peace officer) on account of his having so attended or testified. Churchill, with first Thiessen and then Hampton, conspired against Plaintiff as alleged above for the purpose of impeding, hindering, obstructing, or defeating the due course of justice with the intent to deny Espinoza the equal protection of the laws.

62. Under 42 USC section 1985(3), Defendants and each of them engaged in (a) a conspiracy, (b) designed to deprive Plaintiff of equal protection of the laws, ( d) motivated by racial or other class-based invidiously discriminatory animus, (d) which resulted in injury to Plainitff's person and property, as well as the deprivations of rights or privileges as a United States citizen and, (5) acted in furtherance of the conspiracy as alleged above.

WHEREFORE, Plaintiff prays for relief as set forth below.

**FOURTH CAUSE OF ACTION**

**42 USC §1981**

**(As to Defendants Tracy and Does 1-40)**

**63. Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.**

64. Under federal law, specifically 42 USC section 1981(a), "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and . . . subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

65. "Make and enforce contracts" is defined in 42 USC section 1981(b) as to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Plaintiff and Tracy entered a relevant employment contract at the beginning of Plaintiff's employment with TPD, which was found in the MOU and related materials.

66. Plaintiff is informed that, as to Defendants Tracy, Does 1-40, and each of them,

each was acting in pursuant to official, *de facto* policies and in concert with one another when they injured and impaired Plaintiff, a man with Latin (Mexican) ancestry. Each defendant was acting with the shared objective to injure Plaintiff and others like him. Violations included but were not limited to the following:

a. Right to be free from discrimination based on race and/or protected activity;

b. Right to make/enforce contract; and/or,

c. Right to Equal Protection (full and equal benefit) of the Law.

67. Said rights are substantive guarantees under the United States Constitution.

68. Plaintiff was damaged in an amount according to proof at trial.

WHEREFORE, Plaintiff prays for relief as follows:

**PRAYER**

a. Compensatory, special damages according to proof,;

b. General damages according to proof;

c. For costs of suit and for reasonable attorneys' fees under, *inter alia,* 42 USC section 1988;

d. For pre-judgment and post-judgment interest;

e. For an order requiring Defendants, all persons acting on behalf of Defendants, and each of them, to do the following:

1. To pay Plaintiff commensurate with the Chief's position, including benefits, retroactive to the date Janet Thiessen was hired;

2. To reinstate Plaintiff, with full benefits, retroactive to the date he was placed on administrative leave (April 4, 2013), with credits for the amount he was actually paid;

3. To stop all harassing acts aimed at Plaintiff, and others who may be affiliated with the plaintiff or similarly situated as the plaintiff;

4. To retrain each of the individually-named defendants regarding the proper use of authority and the discipline process;

5. To terminate the individually-named defendant with a history of committing similar acts of malfeasance.

/ / /

f. Such other and further relief as the Court deems just and proper.

Date: December 5, 2016

<u>*/s/ Russell A. Robinson*</u>
By: Russell A. Robinson
Law Office of Russell A. Robinson
Counsel for Plaintiff
JUAN ESPINOZA

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial, as is his right.

Date: December 5, 2016

<u>*/s/ Russell A. Robinson*</u>
By: Russell A. Robinson
Law Office of Russell A. Robinson
Counsel for Plaintiff
**JUAN ESPINOZA**